Good morning, Your Honors. Thank you for hearing an oral argument on this matter. What I'd like to do first is to start with an apology because of the brief, the condition of the brief with multiple fonts. It looks like a ransom note and I apologize. It's difficult to read and I was mortified and continue to be mortified that that's my introduction to the Ninth Circuit panel. So, again. Justice Ginsburg Well, we appreciate that, but we did read the brief and even if our eyes had to move to font to font, it was fine. So we appreciate your comment. Eric Olsen Thank you. That's very generous. Thank you. What I'd like to do is to start off with just some basic explanation of the terms that I believe are the relevant terms to the ERISA consideration. If the Court thinks that that If the Court would rather just delve into questions, then without having me blather  Justice Ginsburg Well, you know, you're welcome to go where you wish, but we come down to is this a retirement plan? And so it seems to me that, you know, there's a few key points that you want to talk about because we're quite familiar with the arrangement and we're quite familiar with ERISA. So I don't know if that will help you in framing your argument. Eric Olsen Well, Your Honor, I guess if the Court would think I'm hearing that the Court doesn't think it's terribly helpful. So if the Court has questions and wants to just delve in Justice Ginsburg Well, just tell us why, you know, we said in Rich we tried to set forth how to determine whether or not a plan was qualified as an ERISA retirement benefits or deferred income. How does this employee equity growth plan match up to that? Eric Olsen With the primary purpose plan? Or just in general? Justice Ginsburg Tell us Eric Olsen Well, Your Honor, Jim Miller worked for Utopi Incorporated. Utopi in 2007 created this plan. The plan also was created alongside of Somerset LLC, which held the plan assets or asset. The asset and the worth of Somerset LLC was a metric by which Utopi's financial obligations would be measured. The intended benefit  Justice Breyer Let me ask you this. Does this provide for deferred income? Eric Olsen Yes, Your Honor. Under the primary purpose of the plan. Justice Breyer Okay. Show me in the plan. Let's go to the plan, the employee equity growth plan. Eric Olsen Paragraph Justice Breyer Which paragraph makes it clear that it's a plan for deferred income? Eric Olsen That would be two sources. One is the use of the word retirement throughout the plan. I understand counsel's argument that that's retirement value of the shares, but that sounds like an issue of fact as to whether a reasonable person or a reasonable juror Justice Breyer Okay. That's one point. Figure another point. Eric Olsen Paragraph five. Paragraph five. Automatic vesting after reaching age 62, regardless of how old, excuse me, how long you worked or 20 years of employment, either of those would appear to be tied to what is commonly I don't think 62 is necessarily an accident. That's an age when somebody first becomes eligible for Social Security. So the plan, the wording of the plan and those two provisions are reasonably interpreted as providing deferred income. They're not paying you this bonus if you will or this extra compensation as part of your monthly check. True, that's not something that you're earning and then they're holding it back, but it is compensation.  Justice Kagan Well, just because you get compensation doesn't mean you have a retirement plan. One thing seems odd about this that would be not like a retirement plan at all is they can I don't know if you want to call these phantom shares or however they're characterized, but you can buy and you can sell those before you retire, right? You can obtain your benefits with penalty, with a pretty steep penalty, prior to reaching 20 years or 62 years of age. Yeah, you just give a you have to give a year's notice on that? You give a year's, well, even if you're 72 and you want to keep working, you can still get your benefits. Right, but if you want to get it before that, you can basically cash it out, right? Yes, just as similarly as say Oregon PERS, you can cash in your Oregon retirement. Also, I don't think that that's something that prevents it from having a primary purpose. Again, I'd note that's not the only purpose. It's the primary purpose. This is a monetary item, we'll call it, for neutrality that's not given to everybody, correct? Correct. That's the participants are the only two requirements are number one, you have to be an employee, two, you have to be chosen to participate at the sole discretion of the Uterpi Board of Directors, which is the plan administrator. That sounds a lot like this Oatway case where they say that it's not a plan, but it's basically they're discretionary and given to certain individuals for service or in addition to what we would normally see in a retirement plan. What do you think are the strongest points that would say this is a retirement plan under ERISA? Well, I think that there are other factors to consider rather than the primary purpose test. That's not the only consideration. There are two tests. There's the Donovan test, of course. With respect to the Donovan test, you have the selection of participants. We've talked about that. Procedure for receiving benefits, give one year's notice or terminate, the Court noted that. Three intended benefits, there's in paragraph 4A and B, there's a pretty detailed situation there with respect to determination of the benefits. And there's also a mechanism which details what the terms of payment will be of that amount that's determined in 4A and 4B. The source of financing is clear. The corporation will pay according to 4A and 4C. So under Donovan, it certainly seems clear that the requirements are met. And I wouldn't see the, I don't believe the primary purpose test in any sense overruled the primary purpose test. Overruled Donovan, in fact. So Counselor, are you saying this is a fact issue and it needs to be remanded for some sort of evidentiary hearing on what? On what the subjective, I mean, your client may have thought it was a retirement plan and the company might have thought it was a let's keep our people here longer plan. How, what if the subjective beliefs are totally contrary? What's the answer? Well, I guess if there, if a reasonable juror could come to either conclusion, then it's what the jury believes. You think a jury decides this? I mean, ERISA is... Well, a reasonable fact finder, shall we say. I would also, you know, I guess I would... I would also say that the fact finder should be able to determine whether or not there is a reasonable juror, not the subjective expectations, is what I'm saying. Well, the Donovan test is from, determined under the standard of a reasonable person from surrounding circumstances. There are four factors. Those are met. Reasonable person seems like a pretty, it seems like a factual determination. And in order for the summary judgment to hold under that standard, it would have to be that there's not enough evidence to allow any reasonable juror, in other words, no reasonable juror, could come to the conclusion that this was a plan. Under the Donovan test, that's just clearly not true. Under the more involved test, I guess the stricter test, the Watkins test, I'd be glad to address that if the Court would like. But similarly, we can look at, just briefly, the plan provides a policy and method for funding the plan under 4A and 4C. The employer, UTERPA's financial obligation is established there. It's a policy and it's a function of the value of the trust asset, and then that is applied, some algebraic formula is applied to that. And that's the policy and the method for funding the plan. When you ask for your benefits, there's this economic figure that's plugged into a formula, and that determines the time and the amount of the employer's obligation. In terms of the ongoing administrative scheme, it's interesting that six years after the creation of the plan, Mr. Olson used his discretion to, I think this is in the appellate's brief, factual section, used his discretion to kind of protect the asset, the prime asset of the trust against falling real estate. For instance, I don't know what greater example there could be of his ability to manage the trust assets. He actually exercised it six years into the trust. And so that and the other factors of discretion, who's chosen as employees, whether to allow following of money, whether or not to get an appraisal or to just sort of stand pat at 5% in a given year, you know, those are all discretionary functions that have a real effect on the participant's benefits. If you take, for instance, if you take your retirement in between appraisal years, that 5% really matters. So with respect to the ongoing administrative scheme, it's clear that this plan meets the test. I have, if anything else that the Court would like to address, I'm happy to do so. Oh, and I guess, I'm sorry, a procedure for amending the plan, obviously that's in there, and a basis for paying to and from the plan. Again, the payments are due when the person makes or starts, when the triggering event happens and the money comes from Uterpi to the beneficiary. And so, you know, there's clearly a basis for paying to and from the plan. So under those two tests, which are the only multifactor tests in the circuit, which I would argue have not been supplanted by the primary purpose test, demonstrate that this is an ERISA plan. And even if you use the primary purpose test, if you look at the document as a whole and the surrounding circumstances, which this gentleman, at the time he decides he wants to retire, he goes and talks to Uterpi and says, hey, I want to retire, I need to get these things in order, that and the timed, the timing and the penalties that are provided under paragraph five show that this is deferred income. This is meant to not give you income and next week's check is to defer that income. Thank you. You want to save the remaining time, I know. Good morning, Your Honors, and may it please the Court. My name is Graham Schweitzer and I represent Defendant Appellees Eric Olson, Uterpi, Inc. and Somerset, LLC. The Defendant Appellees ask this Court to affirm the District Court's award of summary judgment and hold that the equity growth plan at issue is not subject to ERISA for the following three reasons. First, the plan's primary purpose was not to defer compensation or provide retirement income. Second, the plan does not identify a source of financing or describe a method of funding. Third, the plan does not involve an ongoing administrative scheme. Unless you want to start with your questions, which I welcome, I'll start by addressing the primary purpose, which is the test as a result of the Rich v. Schrader case. As this Court knows, in Rich v. Schrader, the Court explained that the paramount consideration for purposes of the Court's inquiry, the Court's ERISA inquiry, is, and I quote, whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits. My colleague suggested that simply by virtue of the fact that funds might be available after retirement, that makes it deferred compensation. The cases that the Court has seen and that we have recited in our briefs say quite the opposite. They say just the simple fact that someone might be able to receive some benefits after retirement, that doesn't make it deferred compensation or a retirement benefit, as we've explained in our brief. The closest we get is there's some, there's a regulation that touches on, that touches on bonus plans. And that is discussed in a number of the cases, and excuse me while I just, there's not an obvious definition. Well, what the regulation talks about, and I'm going to use, it uses the word systematically deferred, compensation that is systematically deferred so that it is received after employment has ceased. This equity growth plan contains nothing that could suggest that it was deferred because it was set up so that compensation was systematically deferred so that people received it after retirement. As the Court knows, it was set up as what we view and what my clients intended as a bonus plan, as a means of encouraging longevity and rewarding employees for working and staying with the company. And as a result, there was a vesting schedule. One of the employees whose declarations in the record is Tyler Reed, he was a young man in his 20s. He would have been fully vested by the time he was 40, 45, entitled to cash out entirely and continue working. With no penalty at that point. Absolutely. Or anyone who chose to work up to age 62 and beyond, like the plaintiff himself, could have cashed out once he reached 62 and continued working with no penalty at all. So I don't believe there's . . . I believe the district court was correct in deciding that this is not a situation, this is not a plan that was intended to provide retirement income or defer compensation until after an employee like the plaintiff ceased working. You said there was an absence of a funding mechanism. Absence of a funding mechanism, yes. And that's my second point. The reason why we believe the district court was correct in awarding summary judgment is . . . Mr. Weiner spoke to two different tests, the Donovan test and the Watkins test, he called it. Under either of those tests, there has to be, under Donovan, a source of financing. Under Watkins, a method of funding. In the equity growth plan, there is no information at all about whether the district court was correct in awarding the summary judgment. There is no information at all to describe how payments would be made into the plan. And it's important to remember that the allegation here is . . . and I want to make sure I get this right. The allegation here is that the equity growth plan is a defined contribution plan. Such a plan, as the Ninth Amendment states, is a contribution to the participant's account. There is no information or suggestion at all that payments were going to be made into an account held for the benefits of a participant. There is no information at all to explain how payments would be made into the plan at all. The plan simply states that participants would receive phantom shares in the Somerset LLC, which owned a house. The intent was to allow participants to share in the equity as the value of the . . . excuse me, I used the term house. It was an office building. As the value of the office building increased, employees with phantom shares would enjoy the benefit of that increased equity, hence the term equity growth plan. And it is a contract with the employee, would you say? Would you agree with that? Yes. It is a contract with the employee. So let's say the person gets to 20 years. At 19 and a half years, the company can't terminate the plan, or can they? I'd want to refer to the contract. I don't want to speak out of turn, because I know there's provisions that give the administrator wide discretion. I believe the answer to your question is no, it cannot be terminated. But I would have to refer to the contract itself, and I don't want to waste the Court's time by trying to find that. And the trial court looked at it as, on summary judgment, I'm going to go this way or this way. It was not contemplated that there was going to be a trial or anything, was there? I don't believe so. In some ERISA cases, and I'm just basing it off what I've read, I see that there's mixed issues of fact and law. But I believe that there is a possibility that the determination was going to be from the Court as to whether or not this was an ERISA plan. But I mean, Mr. Miller's subjective belief about what he signed and what it meant is not controlling, is it? That's my position. That's my client's position. The final point I'll make, my colleague talked about the requirement for an ongoing administrative scheme. As the Court knows, that's a requirement that came out of a number of different cases, starting with the Supreme Court case, Fort Halifax, Packing Co. v. Coyne, and has been refined at length in the Ninth Circuit based on the Velarde v. Pace membership case, DeLay v. Agripac, and Bogue v. Ampex. What we know as a result of those cases is that there must be an ongoing particularized administrative discretionary analysis that is performed with regard to the administration of the plan. Here, there is no such ongoing particularized discretionary analysis that seeks to determine what amounts a plan participant could recover upon a request for payment. If a plan participant requests payment, it simply triggered a mathematical equation. How many shares do you have, how vested are you, and what is the value of Somerset LLC? That's it. Under the cases I've just mentioned, DeLay, Velarde, and Bogue, I submit that the district court was correct in determining there was no ongoing administrative scheme. Unless the Court has any additional questions, I think I'll sit down. Thank you. With respect to ongoing scheme, obviously the conduct of the parties shows that there was, if I can, ongoing particularized discretionary duty in terms of management. That was exercised six years after a plan was created. There was an assessment of the real estate market, a stated desire to protect the LLC from that, and an exercise of that discretion in selling the only measuring stick asset, if you will, from the trust. And I say trust, but the fund. With respect to motive, why did this plan exist? There can be lots of motives. I would posit that it's probably common that one of the reasons employers have pension plans is to encourage loyalty. And I would say if, for instance, well, that's one. Two is the intention or stated intention only goes so far of the people that create the plan. If my motive in doing so, and I'm not saying this was true here, is dishonest, because I just want to scale for my employees, and I'm not saying that's what happened here, that's not going to really remove the plan from ERISA, I would hope. And I would just, in closing, I would move to I think pages 12 and 13 of the appellee's brief. Six years after receiving a copy of the EGP, Plaintiff had his first conversation about it. It started when he said, I want to start getting myself lined up for retirement. When he asked about how much this is worth, and the information was contained in the documents he received in 2007, you can see that the value, what he wanted was a printout, the value, and that's nowhere in the plan. And when you look at that scenario, and I'll move to page 23, my colleague explains that the Court explained that Congress enacted ERISA to deal with a lack of information and safeguards concerning the operation of employee benefits plans. I would say that this situation is precisely the safeguard that ERISA was designed to protect employees against. When it came to retirement time, all the wheels fell off. And even though it says retirement, and even though it says planned, and a reasonable person in the construction industry would, or just someone without a JD would see this as a retirement plan, in spite of all that, all those wheels fall off at retirement time, and this is why we have ERISA. Thank you. Thank you. I'd like to thank both counsel for your argument this morning. Very helpful. Miller v. Olson is submitted. And we'll hear our last case on the calendar, AT&T v. Jackson Utilities.
judges: McKeown, Paez, Lasnik